UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STAETS OF AMERICA, <br> *ex rel.* GERALD POLUKOFF, M.D., <br> <br> Plaintiff/Relator, <br> <br> v. <br> <br> ST. MARK'S HOSPITAL, <br> INTERMOUNTAIN HEALTHCARE, INC., <br> INTERMOUNTAIN MEDICAL CENTER, <br> SHERMAN SORENSEN, M.D., SORENSEN <br> CARDIOVASCULAR GROUP, and HCA, <br> INC., <br> <br> Defendants. | No. 3:12-cv-01277 <br> <br> Judge Sharp |

## MEMORANDUM

Pending before the Court are Defendants' Motions to Dismiss the Amended Complaint. (Docket Nos. 100, 102, and 106). For the reasons set forth below, the Court finds that the claims against Defendant HCA, Inc. warrant dismissal. Without HCA, Inc. as a party, venue in the Middle District of Tennessee is no longer proper. Accordingly, the Court will dismiss the claims against HCA, Inc., reserve ruling on all other pending motions, and transfer the case to the District of Utah.

**I.     Factual & Procedural Background**

This is an action for fraudulent Medicare/Medicaid billing in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").[1]  Plaintiff and Relator Gerald Polukoff ("Relator") brings this action against Defendants St. Mark's Hospital ("St. Mark's"), Intermountain Healthcare, Inc. ("IHI"), Intermountain Medical Center ("Intermountain"), Dr. Sherman Sorensen ("Dr. Sorensen"), Sorensen Cardiovascular Group ("SCG"), and HCA, Inc.

---

[1] Unless stated otherwise, the following facts are drawn from the First Amended Complaint. (Docket No. 90).

1

("HCA"). All of the parties except for HCA are located in and residents of Utah. HCA, a large healthcare company that owns hospitals in a number of states, is incorporated in Delaware with its principal place of business in Nashville, Tennessee. HCA's sole connection to the litigation is that it owns St. Mark's.

Relator alleges that Dr. Sorensen performed medically unnecessary cardiovascular procedures on patients and conspired with the other Defendants to improperly bill the United States Government ("the Government") for those procedures by submitting false claims for reimbursement under Medicare and Medicaid. More specifically, Relator alleges that Dr. Sorensen performed numerous medically unnecessary Patent Foramen Ovale ("PFO") closures on patients at Intermountain and St. Mark's hospitals between December 2002 and December 2011. A PFO is a condition that arises when the foramen ovale, an opening in a fetus's heart that allows oxygenated blood to travel to the left side of the heart, does not close at birth. Many people live with PFOs without complications and indeed never discover that they have a PFO. Other individuals with PFOs may ultimately need to have the opening closed, such as those patients who have recurring cryptogenic strokes or a transient ischemic attack. In those situations, a PFO closure is typically performed via percutaneous procedure. Both Intermountain and the American Heart Association/American Stroke Association have taken the official position that PFO closures are not to be used to treat migraine headaches or asymptomatic white matter lesions. Medicare has not issued guidance on PFOs, but the Government reimburses healthcare providers for only those treatments and procedures that are deemed medically necessary.

Dr. Sorensen appears to have performed PFO closures with great regularity. According to the Amended Complaint, during 2010 Dr. Sorensen performed 861 PFO closures while

doctors at the Cleveland Clinic performed a combined total of 37 PFO closures during the same one-year period. (Docket No. 90 at ¶ 136). Relator alleges that Dr. Sorensen performed so many PFO closures because he relied on the procedure to treat migraine headaches. Relator alleges that Dr. Sorensen falsified some patients' medical records so that the closures looked medically necessary and were therefore eligible for reimbursement from the Government. Relator states that he even witnessed Dr. Sorensen creating a PFO puncture when he started the surgical procedure only to learn that the patient's atrial septum was in fact intact.

The Amended Complaint focuses on the sheer volume of PFO closures performed by Dr. Sorensen as evidence of fraud. To that end, the Amended Complaint contains anonymized billing data for many Dr. Sorensen's patients, which Relator describes as "[a] listing of those medically unnecessary PFO closures and the related procedures, which upon information and belief, were billed to Medicare, Medicaid, or TRICARE."[2] (Docket No. 90 at ¶ 143). Relator argues that many of Dr. Sorensen's PFO closures were fraudulent insofar as medical providers must certify that the services rendered were medically necessary in order to receive reimbursement from the Government. Relator alleges that because many of the PFO closures performed by Dr. Sorensen were not actually medically necessary, Defendants submitted false certifications. Intermountain and St. Mark's allegedly participated in this fraud by turning a blind eye to Dr. Sorensen's practice and by including the PFO closures in their annual Hospital Cost Reports, which they submitted to Government carriers for reimbursements.

Relator gained knowledge of this alleged scheme when he worked as a cardiologist at Intermountain Medical Center from 2008 until 2012, at St. Mark's from 2008 until 2011, and at

---

[2] Medicare is a federal healthcare entitlement program (Docket No. 90 at ¶ 26), Medicaid is a joint state-federal healthcare program that covers certain groups such as the poor and disabled (Docket No. 90 at ¶ 58), and TRICARE is a federally funded healthcare coverage program for military service members and their families, (Docket No. 90 at ¶ 72).

3

SCG from August to November 2011. Indeed, Relator joined Dr. Sorensen at SCG in June 2011 with the precise hope of learning about PFO closures from Dr. Sorensen. Soon after Relator's arrival, however, Intermountain suspended Dr. Sorensen because an internal investigation revealed that he had performed multiple medically unnecessary PFO closures. After Interline suspended Dr. Sorensen, he performed more PFO closures at St. Mark's. Relator contends that Intermountain, St. Mark's, and HCA "allowed and encouraged Dr. Sorensen to perform and submit claims to federal health benefit programs . . . despite clear compliance red flags." (Docket No. 90 at ¶ 3). The main red flag, as noted above, was the rate at which Dr. Sorensen performed PFO closures as compared to other institutions/physicians.

The Amended Complaint includes approximately five to seven pages of background information on HCA. This background information details previous compliance investigations into and FCA cases against HCA, including a resulting Corporate Integrity Agreement that bound HCA until 2009. Relator also describes how HCA's current compliance policies still incorporate many of the terms of the Integrity Agreement. The Amended Complaint does not explain how HCA's background pertains to Relator's current allegations of Medicare fraud. Neither does the Amended Complaint allege any conduct or omissions by HCA that are outside the scope of the described compliance policies.

Relator filed the instant action under seal in accordance with the provisions of the FCA. On June 15, 2015, the United States declined to intervene in the action, pursuant to 31 U.S.C. § 3730(b)(4)(B), giving Relator the right to continue prosecuting the action himself. This Court lifted the seal and ordered the complaint served on June 19, 2015. All of the Defendants moved to dismiss the claims against them in October and November 2015, and Relator amended his

4

complaint on December 3, 2015.[3]  Now, Defendants again seek to dismiss the claims and/or to transfer this case to the District of Utah.  Because HCA, the sole party with ties to Tennessee, should prevail on its motion to dismiss, the entire action must be transferred for improper venue.

## II.     FCA Claims and the Motion to Dismiss Standard

The FCA penalizes anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  It also punishes any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," id. § 3729(a)(1)(B), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," id. § 3729(a)(1)(G).  A separate provision of the FCA penalizes those who conspire to commit any of the foregoing violations.  Id. § 3729(a)(1)(C).  If the government declines to intervene in an action, the relator may proceed independently and be awarded a "reasonable amount"—between 25 and 30 percent—of any proceeds or settlement, along with reasonable costs and attorney's fees.  Id. § 3730(d)(2).

Complaints alleging FCA violations must comply with Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity because "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts."  Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 563 (6th Cir. 2003).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

---

[3] The Court will terminate Defendants' previous motions to dismiss (Docket Nos. 67, 81, 86) as moot because they address the original complaint, which is no longer operative.

5

a person's mind may be alleged generally." The purpose of the heightened pleading standard is to alert defendants "as to the particulars of their alleged misconduct" so that they may respond. United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 503 (6th Cir. 2007). It is also designed to prevent "fishing expeditions," id. at 503 n.11, to protect defendants' reputations from allegations of fraud, ibid., and to narrow potentially wide-ranging discovery to relevant matters, United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 504 (6th Cir. 2008).

Rule 9(b) "is to be interpreted in conjunction with Federal Rule of Civil Procedure 8," which requires a "short and plain statement of the claim." Id. at 503. To survive, a complaint must contain sufficient factual matter, which the Court must accept as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010).

To plead fraud with particularity, the plaintiff must plausibly allege (1) "the time, place, and content of the alleged misrepresentation," (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury. Chesbrough v. VPA, P.C., 655 F.3d 461, 467 (6th Cir. 2011) (citing Bledsoe, 501 F.3d at 504). To survive HCA's motion to dismiss, then, Relator must have plausibly and particularly alleged that HCA knowingly presented a false claim to the Government, falsified a statement or record submitted to the Government, falsified a statement material to payment by the Government, avoided paying money owed to the Government, or

conspired with the other Defendants to commit any of the preceding violations. Because Relator's allegations concerning HCA fall far short of the mark, the claims against HCA must be dismissed.

### III.     Whether Relator's Claims Satisfy the Applicable Standard

The sum total of Relator's specific allegations relating to HCA's purported participation in the fraud Relator alleges are:

- "HCA directly profited from medically unnecessary PFO closures performed at St. Mark's through an agreement, combination, or conspiracy with St. Mark's to defraud the government by getting a false or fraudulent claim allowed or paid and for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim to the Medicare Program, the Medicaid Program, or the TRICARE Program." (Docket No. 90 at ¶ 19).

- "HCA boasted of St. Mark's profitability and could not have possibly been oblivious to the financial contribution of Sorensen's activities to its bottom line, over and above their 'affiliate' institutions throughout the nation." (Docket No. 90 at ¶ 151).

All other mentions of HCA in the Amended Complaint refer to previous FCA suits, the now-expired Corporate Integrity Agreement, HCA's compliance policies, and the relationship between HCA and its wholly-owned subsidiaries. For example, Relator details the obligations previously imposed on HCA by the Corporate Integrity Agreement and references HCA's current compliance policies relating to Medicare Reimbursement, yet does not provide any facts that might give rise to the inference that HCA has violated even a single policy. Relator also makes much of the fact that HCA calls its subsidiaries "affiliates," yet does not explain how that terminology might somehow impose liability on HCA for its affiliates' actions. (Docket No. 90 at ¶ 129). It seems that Relator hopes to elide the well-established principle that parent corporations are not liable for the acts of their subsidiaries, even if they are wholly owned. See Corrigan v. U.S. Steel Corp., 478

F.3d 718, 724 (6th Cir. 2007) (citing United States v. Bestfoods, 524 U.S. 51, 61 (1998)). Without any factual allegations that HCA's own conduct violated the FCA, the relationship to St. Mark's does not alone impose liability on HCA.

Relator provides no particular allegations about when HCA would have learned about the allegedly unnecessary PFO closures or what actions HCA might have taken to perpetuate this fraud. The Amended Complaint is completely devoid of any mention of claims for reimbursement or reports made by HCA to the Government. Moreover, although Relator alleges that HCA participated in a conspiracy to defraud the Government, it does not include any facts about any agreement or even any communication between HCA and the other parties to the litigation. Indeed, although he does not actually say this, Relator seems to rest his claims against HCA on the hope that the Court will intuit that because of HCA's past compliance issues and current compliance policies, HCA should have known of Dr. Sorensen's alleged scheme. Without more, this unsubstantiated speculation simply cannot survive a motion to dismiss, especially not when Rule 9(b)'s heightened pleading standard must be satisfied. Accordingly, the claims against HCA must be dismissed.

**IV.    Venue**

Dismissing the claims against HCA renders venue improper in the Middle District of Tennessee. Claims under the FCA "may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred." 31 U.S.C. § 3732. None of the remaining Defendants resides, transacts business, or allegedly committed fraud in the Middle District of Tennessee.

Not even the general venue provision, 28 U.S.C. § 1391(b), applies here.  Section 1391(b) allows suit in any judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or, if there is no district in which an action may otherwise be brought as provided in this section, in which any defendant is subject to the court's personal jurisdiction with respect to such action.  All Defendants other than HCA reside elsewhere.  Relator has not specified any events in Tennessee and, in fact, the factual allegations in the Amended Complaint are limited to allegedly unnecessary PFO closures that Dr. Sorensen performed in Utah.  Neither has Relator provided the Court with any argument that venue in the District of Utah would be improper.  Accordingly, venue is not proper in this District under either Section 3732 or Section 1391 and the matter must be transferred for further proceedings.

**V.     Conclusion**

For the reasons stated herein, St. Mark's and HCA's Motion to Dismiss (Docket No. 106) will be granted in part.  Specifically, the Motion will be granted with respect to the claims against HCA.  The Court declines to rule on the Motion to Dismiss insofar as it seeks dismissal of the claims against St. Mark's and declines to address the other pending motions to dismiss.  This matter will be transferred to the District of Utah.  A separate Order shall enter.

*[signature: Kevin H. Sharp]*

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE